**In re Jack N. MARTIN, Debtor.**

**Jack N. MARTIN, Appellant,**

**v.**

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellee.**

**BAP No. EC–92–1005–RJP.**
**Bankruptcy No. 91–22754–C–7.**
**Adv. No. 91–2211.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Submitted Without Oral Argument Sept. 3, 1993 [1].

Decided Dec. 14, 1993.

---

1. Appeal submitted without oral argument on September 16, 1992. The Panel issued an order to remand to the bankruptcy court for a limited factual determination. Appeal was resubmitted on September 3, 1993 when appellant provided a copy of the bankruptcy court's Order in Response to Remand.

Oliver R. Lewis, Sacramento, CA, for debtor/appellant.

Roxanne T. Daneri, Sacramento, CA, for appellee.

## OPINION

Before: RUSSELL, JONES, and PERRIS, Bankruptcy Judges.

RUSSELL, Bankruptcy Judge:

The debtor appeals the denial of his, and the granting of the creditor's, motions for summary judgment on the issue of whether the debtor's obligation is nondischargeable under 11 U.S.C. § 523(a)(4).[2]

### I. FACTS

Debtor/Appellant Jack N. Martin ("Martin") was appointed guardian of the person and estate of Andrew A. Murry ("Murry") pursuant to an order of the Sacramento Superior Court. Murry is a veteran of World War II, and has been determined to suffer from battle fatigue. He has been under a guardianship and/or a conservatorship ever since his return home from the war.

When California deleted reference to guardians, in the Probate Code, Martin was designated conservator. As conservator, Martin was required to furnish a bond. In response to a written application by Martin, creditor/appellee Fidelity and Deposit Company of Maryland ("Fidelity") issued the required bond in the amount of $26,000 to the Sacramento Superior Court for and on behalf of Martin. Fidelity would be required to pay

---

**2.** Unless otherwise indicated, all chapter, section, and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

under the terms of the bond if Martin failed to faithfully perform his duties as conservator.

While Martin was conservator, there was a loss to Murry's estate of a mobile home. The circumstances surrounding the loss were not entirely clear from the record.[3] In 1979, Murry married Clara Nygaard ("Nygaard"), and Martin petitioned the Sacramento Superior Court for permission to expend $20,000 to make a down payment on a mobile home in which Murry and Nygaard were living. The Superior Court approved the expenditure. The mobile home was registered to Murry and Nygaard. In the Superior Court trial, Martin had testified that the lending institution required that Nygaard's name be on the registration of the mobile home.

In 1980, Nygaard filed for dissolution of the marriage and claimed the mobile home was community property. After a contested trial, the court found that the mobile home was Murry's separate property. Martin provided the lienholder with a copy of the dissolution judgment and the mobile home was re-registered to show Murry as the registered owner.

Nygaard was apparently dissatisfied with the judgment in the dissolution action and she decided to bypass the court and engage in self-help. She located buyers for the mobile home. Since she was working for a real estate broker, she drove the prospective purchasers to her office, completed the transaction, and in the same questionable manner, procured Murry's signature for the sale. After the lien was satisfied, the sale netted slightly over $20,000. Nygaard believed that an equal division of the proceeds was fair, but only if the sales commission and costs were paid out of Murry's share. She therefore kept $10,000 for herself, paid the real estate broker $4,450 (of which Nygaard received $1,000 for her participation), and paid $6,396.79 to Murry. She then absconded.

After his mobile home was sold, Murry moved into an apartment but never informed Martin that he had changed his address—nor did he tell Martin that his mobile home had been sold. Because Murry always met Martin at his office when he came to pick up his monthly allowance, Martin did not attempt to visit Murry at his mobile home. It was not discovered that the mobile home had been sold until 1982, when a court investigator attempted to visit Murry there. As a result of the discovery, Martin filed a civil suit against Nygaard, but she was successful in evading service of process.

The court appointed an attorney to represent Murry, and that attorney recommended that Martin be removed as conservator and charged with the loss to the estate. After a trial in the Sacramento Superior Court, the court entered an order surcharging Martin in the amount of $20,878.41, plus ten percent interest until paid. The trial court's judgment ordering the surcharge found in pertinent part:

> Jack N. Martin failed to use ordinary care and diligence pursuant to Probate Code Section 2401 in conserving and protecting the personal property of the conservatee, to wit: the mobile home which was valued at sale for $28,950.00 less an outstanding lien of $8,071.59, and as such [Martin] is liable to the estate for the loss thereof.

The California Court of Appeal affirmed the Superior Court judgment, in an unpublished decision, based on Martin's failure to use ordinary care and diligence in protecting the estate.

Subsequently, Martin failed to pay the judgment. Demand was made upon Fidelity to pay the judgment pursuant to the bond. Fidelity paid the sum of $25,730.50 to the county appointed Public Guardian, as successor conservator of Murry and his estate.

In early 1987, Fidelity filed a suit against Martin for reimbursement under Cal.Civ. Code § 2847 (complaint by surety against principal). The Sacramento Superior Court entered judgment against Martin in accordance with a stipulation by the parties. The

---

**3.** This Panel subsequently ordered a four month limited remand for a factual determination to establish what specific conduct caused the loss of the property. Martin's counsel has provided us with an unpublished California Court of Appeal decision outlining the specific conduct which caused the loss of the property.

---

only payment made on this judgment was $54.16.

On April 12, 1991, Martin filed a Chapter 7 petition. Fidelity filed a complaint to determine the dischargeability of the debt, alleging that the debt was nondischargeable because of a defalcation while serving in a fiduciary capacity under § 523(a)(4). Martin filed a timely answer and subsequently filed a motion for summary judgment. In response, Fidelity filed its own motion for summary judgment. Both parties filed an opposition to each other's motions.

The bankruptcy court granted Fidelity's summary judgment motion and denied Martin's summary judgment motion. Martin filed a timely notice of appeal challenging both the denial of his motion and the granting of the summary judgment motion to Fidelity.

## II. ISSUES

1. Whether Fidelity is subrogated to the rights of the conservatee upon payment of the bond on behalf of the conservator.

2. Whether the relationship of conservator-conservatee (guardian-ward) is a fiduciary relationship for purposes of § 523(a)(4).

3. Whether mere non-exercise of ordinary care in failure to account for assets constitutes a "defalcation" within the meaning of § 523(a)(4).

## III. STANDARD OF REVIEW

■ An order granting summary judgment is reviewed de novo. In re Baird, 114 B.R. 198, 201 (9th Cir. BAP 1990); Jones v. Union Pacific R.R. Co., 968 F.2d 937, 940 (9th Cir.1992). Fed.R.Civ.P. 56 is made applicable in bankruptcy proceedings by Fed. R.Bankr.P. 7056. "Viewing the evidence in the light most favorable to the non-moving party, the appellate court must determine whether the bankruptcy court correctly found that there was no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Baird, 114 B.R. at 201. In reviewing a summary judgment, the task of an appellate court is the same as a trial court. Hifai v. Shell Oil Co., 704 F.2d 1425, 1428 (9th Cir. 1983).

## IV. DISCUSSION

A. *Upon payment of the bond, Fidelity acquired all rights of Murry including the ability to assert nondischargeability under § 523(a)(4).*

■ We reject Martin's assertion that Fidelity cannot prevail on a § 523(a)(4) action because no fiduciary relationship existed between Martin and Fidelity. Martin argues that Fidelity's rights are solely contractual, and that the relationship between Fidelity and Martin is strictly that of debtor and creditor.

The California Civil Code plainly defines the rights assumed by a surety:

§ 2848. **Subrogation of surety to creditor's rights**

THE SURETY ACQUIRES THE RIGHT OF THE CREDITOR. A surety, upon satisfying the obligation of the principal, is entitled to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended, and also to require all his co-sureties to contribute thereto, without regard to the order of time in which they became such.

Cal.Civ.Code § 2848 (West 1993).

■ Under common law, the surety, upon satisfying his principal's obligation, is subrogated to the rights and remedies of the creditor against the principal connected with the debt. In re Elizalde's Estate, 182 Cal. 427, 188 P. 560 (1920). By paying the required bond payment, Fidelity assumed all the rights Murry had against Martin, including the right to assert nondischargeability under § 523(a)(4). See, e.g., 3 Collier on Bankruptcy, ¶ 523.14 at 523–111 to 523–112 (15th ed. 1993).

B. *The conservator-conservatee (guardian-ward) relationship is a fiduciary one within the meaning of § 523(a)(4).*

Section 523(a)(4) excepts from discharge certain forms of culpable debtor conduct

while acting as fiduciary under § 523(a)(4). That section reads:

**§ 523(a) Exceptions to discharge**

(a) A discharge. . . . does not discharge an individual debtor from any debt—

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

█ The meaning of "fiduciary" in the context of § 523(a)(4) is an issue of federal law. *In re Short,* 818 F.2d 693, 695 (9th Cir.1987); *In re Baird,* 114 B.R. 198, 202 (9th Cir. BAP 1990). Further, "[t]he broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context." *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986). Section 523(a)(4) excludes constructive, resulting or implied trusts. A fiduciary relationship for purposes of § 523(a)(4) exists only where there is an express or statutory trust. *In re Aubrey,* 111 B.R. 268, 275 (9th Cir. BAP 1990); *see also In re Pedrazzini,* 644 F.2d 756, 758 n. 2 (9th Cir. 1981).

"Although the concept of 'fiduciary' in the dischargeability context is a narrowly defined question of federal law, courts look to state law to determine whether the requisite trust relationship exists." *In re Baird,* 114 B.R. at 202; citing *Ragsdale,* 780 F.2d at 796–97. "If state law creates an express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a fiduciary under § 523(a)(4)." *Baird,* 114 B.R. at 202. "The statute must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt." *Id.* at 202.

The California Probate Code § 2101 specifically denotes the conservator-conservatee relationship as that of a fiduciary relationship:

The relationship of guardian and ward and conservator and conservatee is a fiduciary relationship.

Cal.Prob.Code § 2101 (West 1991).

However, since the requisite fiduciary relationship for purposes for § 523(a)(4) is a question of federal law, a state law definition is not conclusive, but merely instructive:

While [§ 523(a)(4) ] appears to cover the vast array of relationships which might be deemed fiduciary or confidential under state law, as a matter of federal law only fiduciary relationships arising from express or statutory trusts are covered by the statute. State law, however, governs in determining whether such trusts exist. *Chapman v. Forsyth,* 43 [ (2 How.) ] U.S. 202, 208, 11 L.Ed. 236 (1844); *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986); *In re Hooper,* 112 B.R. 1009, 1013 (9th Cir. BAP 1990).

*In re Stokes,* 142 B.R. 908, 909–10 (Bankr. N.D.Cal.1992).

The conservator-conservatee relationship resembles that of an express trust. In a conservator-conservatee relationship, the conservator is charged with holding the assets of the conservatee from the outset, as is the case with an express trust. The res is sufficiently defined, i.e. the conservatee's assets, and the duties are clear from the beginning. Because the conservator is essentially a trustee over all the conservatee's assets for all purposes under state law, he is a fiduciary within the narrow meaning of § 523(a)(4). *See Ragsdale,* 780 F.2d at 797 (holding that a partner was a fiduciary within § 523(a)(4) where state law made clear that a partner necessarily was a trustee over partnership assets for all purposes).

█ We hold that the conservator-conservatee or guardian-ward relationship is that of fiduciary for purposes of § 523(a)(4). In so doing, we are not expanding the scope of § 523(a)(4) to another of the "vast array" of relationships deemed fiduciary under state law that the *Stokes* court counsels against. We simply recognize that the conservator-conservatee relationship is sufficiently similar to an express trust, warranting the application of § 523(a)(4).

C. *A defalcation within the meaning of § 523(a)(4) requires culpable conduct beyond mere negligence in failure to account.*

1. *Defalcation defined.*

The term "defalcation" as used under § 523(a)(4) does not have a precise definition and no legislative history or comment exists to aid the interpretation.

Corpus Juris Secundum has defined defalcation as "the failure of one who has received money in trust or in a fiduciary capacity to account and pay over as he ought...." 26A C.J.S. *Defalcation,* at 125–26 (1956). The primary difficulty is that definitions vary on whether defalcation includes some element of culpable conduct:

> As used colloquially, and in criminal statutes, the word "defalcation" implies some moral dereliction, and as ordinarily understood the term implies some bad faith or misconduct, as distinguished from mere negligence or mistake; but in other contexts it is a broader term, and does not necessarily imply any dishonesty or fraud, or any criminal act.... However, to constitute a defalcation, there must have been mala fides.

26A C.J.S. *Defalcation,* at 125–26 (1956) (citations omitted).

Judge Learned Hand recognized the semantic difficulties concerning the definition:

> Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts.

Central Hanover Bank & Trust Co. v. Herbst, 93 F.2d 510, 511 (2d Cir.1937), aff'g In re Herbst, 22 F.Supp. 353 (S.D.N.Y.1937).

However, after *Central Hanover,* case law under the former Bankruptcy Act was not in agreement as to the scope of conduct constituting defalcation.[4]

Although some courts have included innocent defaults in the definition of defalcation, in fact, there is generally some appearance of wrongdoing within the facts of each such case. *See In re Baird,* 114 B.R. 198, 204 (9th Cir. BAP 1990); *In re Short,* 818 F.2d 693, 694 (9th Cir.1987); *In re Gonzales,* 22 B.R. 58, 59 (9th Cir. BAP 1982).

2. *The purpose behind § 523(a)(4) favors the view that Congress intended that more than mere negligence be required for nondischargeability.*

■ While negligence may be the standard for determining liability, some level of culpability is required for a debt to be nondischargeable under § 523(a)(4). Debts resulting from breaches of ordinary care are normally discharged in bankruptcy.

Only certain narrowly construed exceptions, displaying some level of culpability, are excepted from discharge by Congress in the text of § 523:

> The purpose of the nondischargeability section in general was to remove from the debtor's capacity to discharge certain classes of debts arising from practices Congress deemed so pernicious that bankruptcy should not be able to insulate the debtor from their payment.

*In re Hudson,* 859 F.2d 1418, 1423 (9th Cir. 1988).

■ It is well established that the limits on dischargeability of debts contained in

---

**4.** Courts were divided on whether defalcation required some form of misconduct. *See In re Bernard,* 87 F.2d 705, 707 (2d Cir.1937) ("the misappropriation must be due to a known breach of duty, and not to mere negligence or mistake."); *Kadish v. Phx.–Scotts Sports Co.,* 11 Ariz. App. 575, 579, 466 P.2d 794, 798 (1970) (held that "[a] defalcation clearly requires acts amounting to misconduct or reflecting bad faith, and not merely inadvertence, mistake or negligence."); *Ivy v. Plyler,* 246 Cal.App.2d 678, 54 Cal.Rptr. 894 (1966); *Bannon v. Knauss,* 57 Ohio

App. 288, 13 N.E.2d 733 (1937); *In re Johnson,* 691 F.2d 249, 257 (6th Cir.1982) (defalcation requires more than mere negligence or a mistake of fact).

Other courts held that innocent defaults or mere failures to account for funds constitute defalcation. *See, e.g., Carey Lumber Co. v. Bell,* 615 F.2d 370, 376 (5th Cir.1980); *Matter of Kawczynski,* 442 F.Supp. 413, 418 (W.D.N.Y.1977); *First–Citizens Bank & Trust Co. v. Parker,* 225 N.C. 480, 485, 35 S.E.2d 489, 492 (1945).

§ 523 should be construed narrowly so as to assure that the basic policy of giving the honest debtor a fresh start is not frustrated. *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). Exceptions to discharge are to be construed strictly against creditors and in favor of the debtor's right to discharge. *In re Klapp,* 706 F.2d 998, 999 (9th Cir.1983); *Gleason v. Thaw,* 236 U.S. at 562, 35 S.Ct. at 289. An exception to discharge impairs the debtor's fresh start and should not be read more broadly than necessary to effectuate policy, e.g. preventing debtors from avoiding debts incurred as a result of fraud or other culpable conduct. *In re Ellwanger,* 105 B.R. 551, 556 (9th Cir. BAP 1989).

Given the diversity of definitions of "defalcation" discussed *supra,* it is not clear whether Congress intended the meaning in the culpable sense or the "mere failure to account" sense. Congress could have easily added language that a *per se* failure to account for assets is sufficient for nondischargeability, but no such language appears in, or can reasonably be implied from the text of § 523(a)(4).

We note that even cases holding that any failure to account, without more, constitutes a defalcation, contain facts which indicate some degree of culpability greater than mere negligence. For example, in *In re Short,* 818 F.2d 693 (9th Cir.1987), a partner used funds for personal living expenses. Both *In re Baird,* 114 B.R. at 204, and *In re Gonzales,* 22 B.R. at 59, involved facts where contractors diverted funds that were held in statutory trust for one subcontractor to other subcontractors. Similarly, almost all cases holding the debt nondischargeable had some bad faith present.

In addition, §§ 523(a)(2), (4) and (6) have one thing in common: they require some element of bad faith to render a debt nondischargeable. Because of the stigma that nondischargeability under these sections brings, the Code and the Rules require that complaints pursuant to these sections be filed within a brief period of time.[5] Under

§ 523(a)(4) all the other grounds, i.e. fraud, embezzlement or larceny, require some element of bad faith. Therefore, to read "defalcation" as requiring only a breach of ordinary care would be inconsistent with the design of § 523 in general and, in particular, to the design of §§ 523(a)(2), (4) and (6).

We decline to expand the definition further and hold that the mere failure to use ordinary care in accounting for an asset does not *per se* constitute "defalcation" within the context of § 523(a)(4). There simply must be a showing of some element of bad faith or reprehensible conduct for nondischargeability under § 523(a)(4).

■ We must distinguish situations where a fiduciary had invested funds for a beneficiary and the resulting failure to account was due to a market diminution in the value of the investment or failure to otherwise prudently invest those funds from the situation where the fiduciary was entrusted with funds but failed to produce any record of their disposition. The former is merely negligent, while the latter clearly involves wrongful conduct and would be considered a defalcation.

■ The only conduct by the debtor resulting in the state court judgment was his failure to register the mobile home in his name rather than in Murry's name. Assuming, *arguendo,* that this rises to the level of a "failure to use ordinary case," it clearly does not reflect bad faith or reprehensible conduct. Because a defalcation requires more than mere failure to use ordinary care, the granting of the plaintiff's motion for summary judgment was improper. For the same reasons, the debtor's motion for summary judgment should have been granted.

## V. CONCLUSION

For the foregoing reasons, we REVERSE the granting of the creditor's motion for summary judgment. Further, we REVERSE the denial of the debtor's motion for summary judgment and REMAND with instruc-

---

**5.** Rule 4007 provides that such complaints be filed within 60 days of the first date set for the meeting of creditors.

tions that the court enter an order granting debtor's motion.

PERRIS, Bankruptcy Judge, concurring in part and dissenting in part:

I agree with the majority's resolution of the subrogation issue and its determination that a fiduciary relationship exists for purposes of section 523(a)(4). I disagree, however, with the majority's determination that a defalcation requires bad faith or reprehensible conduct. For this reason, I dissent from the majority's reversal of the bankruptcy court's decision.

The term "defalcation" is not clearly defined in the Bankruptcy Code or its legislative history. Similarly, courts have provided inconsistent indications of whether the term requires some level of culpability greater than negligence or whether any breach of a trust obligation which leads to the loss of trust property is sufficient. In the seminal case, *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937), the court indicated that the term "defalcation" may include innocent defaults so as to reach all fiduciaries who for any reasons are short in their accounts and that the term did not require as much misconduct as the term "misappropriation," which had been held to require an actually or constructively known breach of duty and not mere negligence or mistake. The court then assumed, *arguendo*, that defalcation does require some misconduct and determined that the debtor's conduct in taking money on a conditional authority which he knew could be revoked amounted to a defalcation.[6]

Many cases, both before and after the enactment of the Bankruptcy Code have relied upon *Herbst* to determine that the term "defalcation" does not require intentional misconduct and includes failures to account

arising from negligence or mistake. *See, e.g., Carey Lumber Co. v. Bell*, 615 F.2d 370, 375 (5th Cir.1980); *In re Kawczynski*, 442 F.Supp. 413 (W.D.N.Y.1977). Other cases, however, have indicated that a defalcation clearly requires acts amounting to misconduct or reflecting bad faith or a known breach of duty and not merely inadvertence, mistake or negligence. *See, e.g., Kadish v. Phx.–Scotts Sports Co.*, 11 Ariz.App. 575, 579, 466 P.2d 794, 798 (1970).

In this circuit, at least two Bankruptcy Appellate Panel decisions have stated and applied the rule that a defalcation includes innocent as well as negligent or intentional defaults so as to reach all fiduciaries who are short in their accounts. *In re Baird*, 114 B.R. 198, 204 (9th Cir.1990); *In re Gonzales*, 22 B.R. 58 (9th Cir. BAP 1982). This rule was also stated, arguably in *dicta*, in *In re Short*, 818 F.2d 693, 695–96 (9th Cir.1987).[7] In *Baird* and *Gonzales*, the conduct at issue involved the failure of the debtors to pay over trust funds to the subcontractors entitled to those funds. The key factor leading to a finding of defalcation in those cases was that the debtors breached their trust obligations by failing to pay over the pertinent sums. Although there are indications in those cases that the debtors paid the funds to other subcontractors, there is no indication that the debtors acted in bad faith or engaged in intentional misconduct. In fact in *Gonzales*, the Panel rejected the debtor's contention that there was no defalcation because the failure to account for the funds was unintentional. In *Baird*, the fact that the debtor may have acted in accordance with common industry practice did not prevent a finding of defalcation.

Although, as the majority suggests, there are arguable policy reasons supporting a restricted definition of the term defalcation, there are also policy reasons supporting a

---

6. In *Herbst*, the debtor, a receiver of a parcel of real property, took and spent money awarded to him under a court order approving his intermediate account without waiting for the expiration of the time to appeal the order. The order was appealed and reversed. The court determined that the debtor knew or was charged with notice that the order might be appealed and would not protect him if it was reversed. The court found that the debtor committed a defalcation.

7. In *Short*, the debtor used partnership funds to pay for his personal expenses. The conduct at issue, therefore, involved intentional conduct and the court's suggestion that defalcation includes innocent defaults of a fiduciary who fails to account for money received was not necessary to its decision.

determination that defalcation should include innocent defaults by a fiduciary. Even if nondischargeable debts must arise from some culpable conduct, the requisite culpability or "badness" to conform to the spirit of the bankruptcy laws is supplied by the special legal status of a fiduciary and the breach of the attendant duties and higher standard of dealing. *See In re Johnson,* 691 F.2d 249, 256 (6th Cir.1982); *In re Twitchell,* 72 B.R. 431, 436 (Bankr.D.Utah 1987), *rev'd* 91 B.R. 961 (D.Utah 1988), *rev'd without op.* 892 F.2d 86 (10th Cir.1989); *see also Restatement (Second) of Torts* § 874, comment b (one who commits a breach of fiduciary duty is guilty of tortious conduct). In addition, in other provisions of the Bankruptcy Code, Congress has provided special protection for those in a trust relationship with the debtor. *See* § 541(d). A recognition that debts arising from any breach of such trust relationships are nondischargeable is consistent with this special protection.

The majority's standard of some element of bad faith or reprehensible conduct is, I believe, flawed. The majority does not explain what level of culpability is required. Is reckless conduct sufficient or must the conduct be intentional tortious conduct? If intentional tortious conduct is required, the majority's standard renders section 523(a)(4) unnecessary in light of the broad definition of willful and malicious conduct applied under 11 U.S.C. § 523(a)(6). *See, e.g., In re Cecchini,* 780 F.2d 1440, 1443 (9th Cir.1986). Finally, what would be the result when a trustee does not adequately supervise his or her employees and funds are misdirected through the intentional misconduct of the employee? Arguably, the fact that the trustee's conduct does not rise above the level of negligence would allow the debt to be discharged.

I believe that we are compelled to follow *Baird* and *Gonzales.*[8] Those cases reject a requirement of some degree of culpability beyond a mere breach of fiduciary duty that results in a shortage in the trust fund or trust property.

Applying that rule in this case, the state court found that the debtor breached the fiduciary duties placed upon him under Cal. Prob.Code § 2401 by failing to use ordinary care in managing and controlling the property. This breach resulted in a loss to the property. There has, therefore, been a defalcation under section 523(a)(4).

---

**8.** *California Dept. of Health Services v. United States Dept. of Health & Human Services,* 853 F.2d 634, 638 (9th Cir.1988) (a circuit court panel must follow a previous decision of another panel, absent a subsequent change in substantive law).