In re Gudrun **PICKERING**, a/k/a Goody Pickering, Debtor.

Rick E. **RAYMOND**, Plaintiff,

v.

Gudrun **PICKERING**, Defendant.

Bankruptcy No. 94–11322–7.
Adv. No. 95/00001.

United States Bankruptcy Court,
D. Montana.

May 15, 1995.

James A. Patten, West, Patten, Bekkedahl & Green, P.L.L.C., Billings, MT, for plaintiff.

Jerrold L. Nye, Nye & Meyer, P.C., Billings, MT, for debtor/defendant.

## ORDER

JOHN L. PETERSON, Chief Judge.

In this Adversary Proceeding, the Plaintiff seeks a determination that the debt owed by the Debtor/Defendant is nondischargeable under 11 U.S.C. § 523(a)(4).[1] After answer, trial of the cause was heard on March 14, 1995, with each party present and represented by counsel. Post-hearing briefs have been filed and the matter is ready for decision. The parties agreed this Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 157(b)(2)(I) and 1334.

At trial, the Court adopted certain findings of fact issued by the Honorable Ken-

---

**1.** Section 523(a)(4) provides:
(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

\*    \*    \*    \*    \*    \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

neth R. Wilson, District Judge of the Montana Sixteenth Judicial District, Custer County, Montana, in Cause 20,022 entitled "Rick E. Raymond, Plaintiff v. Dan Pickering and Gudrun Pickering, Defendants". This Court's adoption of the following findings of fact is made pursuant to Restatement (Second) of Judgments § 13 (1982), under the doctrine of issue preclusion, even though a final judgment in the above state court action was not issued due to the filing of the Defendant's Bankruptcy Petition, which invoked the automatic stay provisions of 11 U.S.C. § 362 against continuation of the state court action. Comment *g.* to § 13 of the Restatement at pp. 135–136 states:

> *Criteria for determining finality in the application of issue preclusion.* The requirement of finality of judgment is interpreted strictly, as indicated in Comment *a.*, when bar or merger is at stake.... Usually there is no occasion to interpret finality less strictly when the question is one of issue preclusion, that is, when the question is whether decision of a given issue in an action may be carried over to the second action in which it is again being litigated. (If the second action is on the same claim, preclusion is an instance of direct estoppel; if it is on a different claim, preclusion is an instance of collateral estoppel. See § 17, Comment *c.*) But to hold invariably that that kind of carry-over is not to be permitted until a final judgment in the strict sense has been reached in the first action can involve hardship—either needless duplication of effort and expense in the second action to decide the same issue, or, alternatively, postponement of decision of the issue in the second action for a possibly lengthy period of time until the first action has gone to a complete finish. In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment. See illustrations 1–3.... Before doing so, the court should determine that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered. Thus preclusion should be refused if the decision was avowedly tenta-

tive. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purposes of preclusion. The test of finality, however, is whether the conclusion in question is procedurally definite and not whether the court might have had doubts in reaching the decision.

*See, Borg–Warner Corp. v. Avco Corp.,* 850 P.2d 628, 634–635 (Alaska 1993).

■ The doctrine of collateral estoppel based on a prior federal or state court judgment applies in a bankruptcy proceeding. *Grogan v. Garner,* 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991); *In re Daley,* 776 F.2d 834, 838 (9th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). *In re Bugna,* 33 F.3d 1054, 1057 (9th Cir.1994) states, "In determining the collateral estoppel effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel."

The Montana Supreme Court in *Aetna Life & Cas. Ins. Co. v. Johnson,* 207 Mont. 409, 414, 673 P.2d 1277, 1280 (1984) specifically notes:

> However, res judicata is different from collateral estoppel. Collateral estoppel involves preclusion of *issues* primarily litigated and res judicata is preclusion of *claims* that have been litigated. *Larry C. Iverson, Inc. v. Bouma (Mont.1981)* [195 Mont. 351], 639 P.2d 47, 38 St.Rep. 1911.

The last Montana Supreme Court decision to discuss the elements of *res judicata* and collateral estoppel, *Berlin v. Boedecker,* 268 Mont. 444, 451–53, 887 P.2d 1180, 1185 (1994), like other preceding Montana cases on this subject, have confused the distinction between *res judicata* (claims preclusion) and collateral estoppel (issue preclusion). If one goes back to *In re Marriage of Stout,* 216 Mont. 342, 701 P.2d 729, 733–734 (1985), the court reflects that:

> In *Aetna Life and Casualty Insurance Company v. Johnson* (Mont.1984) [207

Mont. 409], 673 P.2d 1277, 41 St.Rep. 40, we adopted the test to determine the applicability of collateral estoppel first articulated in *Bernhard v. Bank of America* (1942), 19 Cal.2d 807, 122 P.2d 892. (1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication? See 673 P.2d at 1279.

This, however, as shown by *Bernhard*, is the definition of the doctrine of *res judicata*, not collateral estoppel. 122 P.2d at 895. *Berlin* continued the misconception by defining *res judicata* as having the following elements: "(1) the parties or their privies are the same; (2) the subject matter of the action is the same; (3) the issues are the same and relate to the same subject matter; and (4) the capacities of the persons are the same in reference to the subject and to the issue between them." 887 P.2d at 1184. Note the absence of the requirement of a final judgment in this definition, particularly where The Restatement (Second) of Judgments § 13 appropriately notes, "[T]he rules of res judicata are applicable only when a *final judgment* is rendered." (Emphasis added).

*Berlin* then continues to define collateral estoppel (in fact, it is a definition of *res judicata* ) as having 3 elements, namely, "(1) the issue has been decided in a prior adjudication and is identical to the one presented; (2) a final judgment on the merits was issued; and (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication." 887 P.2d at 1185. Yet, this is precisely the definition of *res judicata*, not collateral estoppel, cited in *Bernhard*, 122 P.2d at 895.[2] As The *Restatement* § 13 states: "However, for purposes of issue preclusion (as distinguished from merg-

er and bar), 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."

■ In summary, taking the *Berlin* case, if one substitutes the term "collateral estoppel" at 887 P.2d at 1184 for the term "res judicata" and substitutes the term "res judicata" for "collateral estoppel" at 887 P.2d at 1185, then the definitions of each doctrine are appropriate.

■ *Berlin* makes note that "identity of the issues is the most important and requires that the precise question has been litigated in the prior actions." *Id.* While the *Berlin* decision speaks in terms of requiring a final judgment under the erroneous definition of collateral estoppel, in truth the Montana Supreme Court has used that criteria only in *claims* preclusion, i.e., *res judicata* cases. I have no doubt that the Montana Supreme Court upon reflection would adopt the criteria for *issue* preclusion set forth in Restatement (Second) of Judgments, § 27[3] (1982), which states at p. 262:

> k. *Requirement of a valid, final judgment.* The requisites of a valid judgment are set forth in § 1, and the definition of a final judgment may be found in § 13. Particular reference is made to the distinction in § 13 between finality for purposes of merger and bar and finality for purposes of issue preclusion. Pursuant to this distinction, a litigation may have reached a stage at which issue preclusion is appropriate even though claim preclusion—application of the rules of merger and bar—is not.

The findings of fact in the state court action (Exhibit 12) were made after trial, in which the same parties in this action were the same parties in the state court proceedings, each represented by counsel, which pre-

---

**2.** The California Supreme Court states in *Bernhard:*

> In determining the validity of a plea of res judicata three questions are pertinent: Was the issue decided in the prior adjudication identical with one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

**3.** Section 27 reads:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim.

sented the same evidence as would be presented in this dischargeability case. The state trial court issued detailed findings on the relevant issues of fact which would be the same findings based on the same issues of fact presented in this case. Issue preclusion is therefore appropriate, as the findings are definite and final, even though a final judgment was not issued.

The issues remaining to be decided in the case *sub judice* are whether the findings support a legal conclusion of non-dischargeability under § 523(a)(4), whether the amount of the debt should include interest and attorney's fees and if so, what the final amount of the debt should be. Therefore, this Court adopts the findings of fact from Exhibit 12 stated below.[4]

This Court does not adopt and has refused findings 10 and 26 [5] and also does not adopt any of the conclusions of law of the state court action.

## FINDINGS OF FACT

1. Defendants Gudrun Pickering (hereinafter "Gudrun") and George Raymond, Jr. (hereinafter "George") were appointed Co–Conservators of the estate of Rick Edwin Raymond (hereinafter "Rick") on December 8, 1983. At that time, Rick was disabled as a result of head injuries he had received in the Fall of 1983. Gudrun is the natural mother of Rick and George is the oldest brother.

2. Defendants Gudrun and George were appointed Co–Guardians of the person of Rick on July 11, 1984. This appointment followed the commitment of Rick to Warm Springs State Hospital in the Spring of 1983.

3. At the time of the appointment of Gudrun and George as Co–Conservators of Rick, Rick had no estate. The appointment was for purposes of pursuing legal action for the injuries Rick had received. Rick had no estate, other than the personal injury cause of action and a cause of action for a personal injury in Colorado, at the time of Gudrun and

George's appointment as Rick's Co–Guardians in July of 1984.

4. Gudrun made application with the Social Security Administration for disability benefits for Rick in 1984. Benefits were originally denied, but were granted after an administrative hearing. Accrued benefits in the sum of $4,816.00 were received in August of 1984 and were the first funds received by the Guardians and Conservators.

5. The Guardians and Conservators did not file any annual accountings with the court. On June 14, 1989, Rick petitioned the court to be restored to competency and for an accounting. Following the hearing, the court on July 10, 1989, entered an order restoring Rick to competency, directing the Conservators and Guardians to file an accounting, and releasing the Conservators and Guardians, subject to any objections to the accounting. The court's order provided that an agreed upon sum from the estate was to be used to pay accountants to prepare the accounting. The parties were not able to agree upon such a sum and on August 23, 1989, the court entered an order directing the Conservators and Guardians to file an accounting within 30 days of August 17, 1989.

6. On September 11, 1989, Gudrun and George filed their accounting with the court. The accounting was prepared with the assistance of Tracy Raymond, the daughter of Gudrun and sister of George and Rick. This accounting was received into evidence and will hereafter be referred to as the "Tracy Raymond Accounting". The Hazel Stabler Accounting will be referred to as the "Stabler Accounting".

7. The Tracy Raymond Accounting was an attempt by the Guardians to essentially reconstruct the Guardian–Ward financial relationship from December 8, 1983, to July 20, 1989, through memory, a limited number of checks and receipts, and mostly guesswork leading to a self-serving conclusion that the Plaintiff owed the Conservatorship $12,-

---

4. While this Court has made minor changes to the state court findings, none constitute a change in substance.

5. Finding 10 involves denial of the conservator fees under Montana law and Finding 26 finds

attorney's fees are due the Plaintiff, but no amount is fixed. This Court makes an independent finding of the issues of attorney's and accountant's fees due under Montana law.

843.93. The Plaintiff filed timely objections. Hazel Stabler, a C.P.A., was retained by the Plaintiff to render an accounting based on records of deposits, receipts, withdrawals, and an attempt to collate the Tracy Raymond Accounting and also through verbal contract with the principals.

8. The Court finds specifically that the Conservators have the burden of accounting for the trust corpus and resulting income and expenses of the guardianship, and to keep appropriate records and to not commingle funds. As the two proffered accountings reflect, there is a paucity of records. The Tracy Raymond Accounting does not meet any minimum standards nor does it resemble an accounting contemplated in the Guardianship–Conservatorship statutes. The Court therefore finds that the Guardians were negligent in handling the affairs of the guardianship and conservatorship.

9. The most credible explanation of the dealings among the parties can be gleaned from Mrs. Stabler's attempt to make sense out of this protracted mess. Defendants dealt with the guardianship property as if it were their own by commingling funds and doling to the Plaintiff amounts of money in dribbles.

10. Refused.

11. Mont.Code Ann. § 72–5–409 provides, *inter alia*, that as cause for appointment of a conservator the person is unable to manage the person's affairs effectively for reasons of mental illness, mental deficiency or physical illness or disability. With respect to this statute the following occurred in Probate File 5311:

On October 28, 1983, George and Gudrun petitioned the Court for appointment as Co–Conservators of Rick and alleged, "Rick has received head injuries from ... (an) automobile accident and fall and is unable to manage his personal financial affairs."

On December 8, 1983, the Honorable A.B. Martin signed an order appointing Gudrun and George Co–Conservators of Rick.

On December 9, 1983, Gudrun and George signed Letters of Conservatorship accepting their duties with respect to Rick and swore that they will perform, according to law, the duties of conservators.

12. Mont.Code Ann. § 72–5–306, *inter alia*, provides that a guardianship for an incapacitated person may be used only as is necessary to promote and protect the well-being of the person. In their petition filed May 8, 1984, Gudrun and George alleged, "The appointment of a guardian is necessary because the protected person (Rick) has received head injuries that have rendered him unable to manage his personal affairs and welfare. Said protected person has been involuntarily committed to Warm Springs State Hospital."

On July 11, 1984, the Honorable A.B. Martin appointed Gudrun and George guardians of Rick and found, "[T]hat due to (Rick's) ... mental condition he is unable to manage his personal affairs."

On July 11, 1984, before a Notary Public, Gudrun and George signed Letters of Guardianship and under oath they "do solemnly swear that we will perform, according to law the duties of such guardians."

13. With respect to the foregoing proceedings both Defendants testified that neither of them was made aware of their duties as Conservator and/or Guardian. The Court does not accept this declaration as an excuse to completely ignore the duties which they undertook through their oaths in the Letters of Conservatorship and the Letters of Guardianship because both these Defendants are intelligent, well-versed in business affairs and easily could have undertaken an inquiry as to what was expected of them.

14. During the course of the management of Rick's money Gudrun, in particular, caused the Conservatorship to invest in a cattle operation with Gudrun and Gudrun's spouse. In making this decision, the financial consequences of which have caused the bulk of the dealings with the conservatorship funds, as evidenced in the proffered Tracy Raymond Accounting and highlighted in the Stabler Accounting. Gudrun testified that the cattle operation was assented to by Rick. The Court rejects this contention because it is inconsistent with the previous court orders that Rick was incompetent to manage Rick's

own affairs. The Defendants knew that for this reason, among others, it was incumbent upon and essential for the Defendants to handle Rick's money in a manner which would leave an unassailable paper trail and not commingled with the assets of the Defendants, the cattle operation, or any other third-party entity.

15. Mont.Code Ann. § 72–5–424 requires that an inventory be filed within 90 days from appointment and that the conservator maintain records. An inventory was never filed and the statutory requirements for maintaining records was woefully lacking to the extent that the conservators were negligent. Mont.Code Ann. § 72–5–548 [sic] requires annual reports unless waived by the judge. There were no annual reports filed nor was there a waiver by the judge.

16. Mont.Code Ann. § 72–5–423 makes it incumbent upon a conservator as a fiduciary to observe the standards of care applicable to trustees. Mont.Code Ann. § 72–34–110 imposes a duty of care on a trustee to keep the trust property separate from other property. This duty was totally ignored by the Defendants.

17. Mont.Code Ann. § 72–5–411 authorizes the court to require a surety bond in an amount equal to the value of the property plus one year's estimated income. This case cries out for the existence of a surety bond, however, since the Defendants neither filed an inventory or an accounting there was no evidence before the court to move its discretion.

18. Accordingly, the Court finds that through their negligence the Co–Guardians and Co–Conservators are liable to the Plaintiff for the funds that they did not and could not account for because of their failure to maintain and because of their failure to use even the slightest care to maintain records and segregate the property.

The Court finds that the Plaintiff's damages are those amounts reflected in the Hazel Stabler Accounting and are the difference between the amounts received and the amounts which could be accounted for by records or lack thereof kept and presented by these Defendants.

19. The Court finds that the Defendants Gudrun and George during the course of their duties as Conservators and Guardians received the following amounts which required administering under their charged duties by the Letters of Conservatorship and Guardianship:

| | |
|---|---|
| Social Security–Form 1099–1983 & 1984 | $ 9,046.00 |
| Social Security–Form 1099–1985 | 4,236.00 |
| Social Security–Form 1099–1986 | 4,380.00 |
| 3 Mo. @ $367.00–Form 1099–1987 | 1,101.00 |
| *Rick received Social Security payments personally after March, 1987 | |
| Total Social Security Benefits | 18,763.00 |

12/23/85

| | |
|---|---|
| V.A. Insurance–Bob Raymond $7,707.67 × ¼ | 1,926.92 |

3/11/88

| | |
|---|---|
| Life Insurance proceeds from Commercial Travelers & Western States, remitted by Law Offices of Randall Lee Garrison, P.C. $11,129.69 | 2,225.94 |

9/10/86

| | |
|---|---|
| Denver settlement—(net) | 9,547.75 |

1986

| | |
|---|---:|
| Sundance settlement | 22,299.20 |

12/31/86

| | |
|---|---:|
| Josephine Raymond Estate | 17,561.44 |

| | |
|---|---:|
| Interest Earned on Savings—1986 | $    60.56 |
| —1987 | 259.78 |
| —1988 | 51.49 |
| CD # 73473 cashed 6/11/87 | 1,244.03 |
| CD # 75025 cashed 5/24/89 | 805.17 |
| CD # 75028 cashed 5/24/89 | 322.08 |
| —1988 | 29.41 |
| | 2,772.52 |
| TOTAL | $103,364.46 |

---

20. The Court, therefore, finds that during the course of the Conservatorship–Guardianship, Gudrun and George had under their control Rick's monies totaling $103,364.46. It should be noted that the Tracy Raymond Accounting agrees with the Hazel Stabler Accounting as to the monies received with the exception that $1,585.00 was deducted from the first social security check of $9,046.00, to pay past expenses and $12,030.00 were the alleged profits from a purported agreement between the Ward and Gudrun in a cattle operation. The Court finds the deduction of $1,585.00 to be legitimate and ignores for all purposes the alleged profit to Rick of $12,030.00 from the cattle operations. The Court finds $101,779.46 to be the asset from which payments were to be made on Rick's behalf.

21. The expenditures are the most troubling aspect of this case. The Hazel Stabler Accounting is an independent assessment of the relationship between the parties based on the best accounting principles Stabler could apply given the state of the records. This accounting shows that Rick received $69,199.61. The Court finds from all of the evidence that amount to be correct. Given the fact that Rick was incompetent and the fiduciary duty owed to Rick by the Defendants, Rick does not have the burden of proof with respect to these financial transactions. On the other hand, the Defendants have a strict burden to prove and establish a true and correct accounting. Should there be gaps and inconsistencies in this area the attendant consequences should be borne by the fiduciaries. The Tracy Raymond Accounting does not rise to even the semblance of an accounting contemplated in this type of action. Accordingly, the Court finds that the Plaintiff is entitled to receive a judgment in the amount of $35,079.85 which is the difference between $101,079.46 and $66,699.61.

22. The Court further finds that investing Rick's assets in the cattle business without the Court's approval was a breach of Defendants' fiduciary duties and violated the statutes with respect to conservators and guardians.

The Court denies the accounting proffered by the Defendants and filed with the state court on September 13, 1989, and sustains Plaintiff's objections to said accounting in accordance with the foregoing findings.

23. For purposes of this action the Court finds that up to the court's order restoring Rick to capacity on July 10, 1989, Rick was not competent to contract especially with relationship to the cattle enterprise, therefore the Court rejects the testimony by the Defendants and their witnesses that Rick was a willing participant in this business.

24. The Court finds that had the Guardians handled Rick's funds in accordance with the duties imposed by law and made judicious and safe investments, the moneys would have accumulated at least at a rate consistent with the prevailing CD rates dur-

ing the period of their control. The Court further finds that the Ward is entitled to be made whole. Plaintiff offered Exhibit I in the state court proceeding setting forth a projected interest accumulation from the period of 1983 through 1992 at a rate of eight and ten percent per annum to be $30,257.00. The Court finds that this is excessive, however, it will allow a recomputation of interest from 1983 through 1992, at the prevailing CD rate and further award interest at the rate of ten percent per annum from December 22, 1992.

25. The Uniform Probate Code, among other things, provides that guardians and conservators are entitled to reasonable compensation for their services, including costs, expenses, and attorney's fees. Because of their total failure to comply with the statutory mandates with respect to the Guardianship and Conservatorship of Rick, the Court specifically finds that neither Gudrun nor George are entitled to fees for their services and further finds that they shall bear the costs and expenses, including attorney's fees, associated with this action and probate 5311.

26. Refused.

27. The Court finds that as a matter of equity George's joint and several liability should be limited to the period from 1983 to the time when George turned over to Gudrun the assets of the Conservatorship which Gudrun administered for the full period thereafter.

This Court makes additional findings of fact as follows based on the evidence submitted at trial on March 14, 1995, to-wit:

28. Based upon Exhibits 9 and 10, and the testimony of Hazel Stabler, the Court finds that the investments of the Debtor, if properly handled in a certificate of deposit account, at prevailing rates of interest from 1983 through 1992, would have earned $28,891.00 additional interest during the period of the Conservatorship.

29. By Montana law, (Mont.Code Ann. § 72–5–432) as stated in Finding No. 25, the Conservators would have been entitled to reasonable compensation for their services had the Conservators properly performed their fiduciary duties. I find that by reason of such attorney fee statute, where the Conservator breaches the fiduciary duties, the Plaintiff Ward is entitled to an award of attorney's fees for the breach of the fiduciary obligations. The Montana "Trust Code," Chapters 33 through 36 (Mont.Code Ann. § 72–33–101 et seq.) does not apply to conservator proceedings under §§ 72–5–101 to 502 by virtue of §§ 72–33–102 and –106 and § 72–5–405. Section 72–5–436(4) specifically allows the Court to determine the liability between the estate and the conservator and may surcharge the conservator as is appropriate.

30. The Court finds the attorney fees expended on behalf of the Plaintiff Ward in the state court proceeding, together with the costs, as shown in Exhibit 8 in the sum of $14,227.30 were reasonable and necessary costs required to be expended by the Plaintiff in the objection to the Defendant's accounting in state court. The Court further finds the amount of accountant's fee required to be expended on behalf of the Ward as shown by Exhibit 11 in the sum of $6,020.05 was also a reasonable and necessary expense in the accounting proceeding. The Court finds such fees and costs should be surcharged against the Debtor/Defendant pursuant to § 72–5–436(4) as part of the claim due the Plaintiff from the Debtor/Defendant.

31. The Court finds the total debt owing to the Plaintiff by the Debtor/Defendant is the sum of $84,218.20.

## CONCLUSIONS OF LAW

The issue as to dischargeability under Section 523(a)(4) is settled by *In re Martin,* 161 B.R. 672 (9th Cir. BAP 1993) and cases cited therein. *Martin* holds under § 523(a)(4) that the meaning of "fiduciary" is an issue of federal law and for the purposes of § 523(a)(4), a fiduciary relationship exists only where there is an express or statutory trust which is determined under applicable state law. 161 B.R. at 676. Pertinent to the present case that the Debtor/Defendant was a fiduciary under § 523(a)(4) is this language:

"If state law creates an express or technical trust relationship between the debtor and another party and imposes trustee status upon the debtor, the debtor will be a

fiduciary under § 523(a)(4)." *Baird,* 114 B.R. at 202. "The statute must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt." *Id.* at 202.

*Id.* at 676.

■ Montana has specifically held that in a conservatorship of a person under disability under § 72-5-401 et seq. (and particularly § 72-5-421(3)), the conservator acts as a fiduciary. *Matter of Estate of Clark,* 237 Mont. 179, 772 P.2d 299, 301–302 (1989). Thus, I conclude the first prong of liability, the fiduciary test, is satisfied.

■ Was there a defalcation under § 523(a)(4)? Again *Martin* summarizes this test.

Although some courts have included innocent defaults in the definition of defalcation, in fact, there is generally some appearance of wrongdoing within the facts of each such case. *See In re Baird,* 114 B.R. 198, 204 (9th Cir. BAP 1990); *In re Short,* 818 F.2d 693, 694 (9th Cir.1987); *In re Gonzales,* 22 B.R. 58, 59 (9th Cir. BAP 1982).

\* \* \* \* \* \*

We decline to expand the definition further and hold that the mere failure to use ordinary care in accounting for an asset does not *per se* constitute "defalcation" within the context of § 523(a)(4). There simply must be a showing of some element of bad faith or reprehensible conduct for nondischargeability under § 523(a)(4).

We must distinguish situations where a fiduciary had invested funds for a beneficiary and the resulting failure to account was due to a market diminution in the value of the investment or failure to otherwise prudently invest those funds from the situation where the fiduciary was entrusted with funds but failed to produce any record of their disposition. The former is merely negligent, while the latter clearly involves wrongful conduct and would be considered a defalcation.

*Martin,* 161 B.R. at 677, 678.

I conclude based on the undisputed facts that the Defendant not only commingled the trust assets of the Conservatorship with the Defendant's cattle operation, but wholly failed to account or produce adequate records of such wrongful investment. As findings 14 and 15 clearly elaborate, the Defendant caused the estate *res* to be invested only in the Defendant's business, which were the "bulk of the dealings" of conservatorship funds. While the findings indicate the Defendant was negligent in performing duties as to accounting, the findings go further than mere negligence. They show a reckless and wrongful handling of the estate funds, from which the account comes up short over $34,000. As stated in *In re Stephenson,* 166 B.R. 154, 160 (Bankr.S.D.Cal.1994):

Under the Bankruptcy Act, "defalcation" meant, "the failure of one who has recovered moneys in trust to pay it over as he ought." *In re Herbst,* 22 F.Supp. 353, 354 (S.D.N.Y.1937), *aff'd,* 93 F.2d 510 (1937). Defalcation has the same meaning under the Bankruptcy Code. *In re Baird,* 114 B.R. at 198; *In re Martin,* 161 B.R. 672 (9th Cir. BAP 1993).

In sum, the Defendant acted in bad faith. It is not simply a matter of lack of ordinary care. For clearly the Defendant, using the Plaintiff's funds in the Defendant's cattle operation, sought to improve the Defendant's largess not the Conservatorship, and then had no records to even support such expenditures. I conclude the Plaintiff has shown by a preponderance of the evidence that the Debtor/Defendant dealt with the Guardianship funds "as if they were her own", thus causing a defalcation by a fiduciary within the meaning and interpretation of § 523(a)(4). The entire debt owed to the Plaintiff is thus nondischargeable under § 523(a)(4).

IT IS ORDERED the Clerk shall enter Judgment in favor of the Plaintiff, Rick Edwin Raymond, and against the Defendant Gudrun Pickering, that the debt of $84,218.20 is nondischargeable under 11 U.S.C. § 523(a)(4).