In re William M. SCHMIDT, Gareth
G. Schmidt, Debtors.

Patricia Trunnels, Plaintiff,

v.

William M. Schmidt, Gareth
G. Schmidt, Defendants.

Bankruptcy No. 99–21290–7.
Adversary No. 99/00080.

United States Bankruptcy Court,
D. Montana.

May 26, 2000.

David J. Wing, Butte, MT, for Plaintiff.

Gregory W. Duncan, Helena, MT, for Debtor.

## *ORDER*

RALPH B. KIRSCHER, Bankruptcy Judge.

In this adversary proceeding the Plaintiff, Patricia Trunnels ("Patricia"), seeks an exception to the discharge of the Defendants/Debtors William M. Schmidt ("Bill") and Gareth G. Schmidt ("Gareth"), in the sum of $714,014.85 for fraud or defalcation under 11 U.S.C. § 523(a)(4). Gareth served as Trustee of the Gagle Family Trust (the "Trust"), a trust established by Roy H. and Myrtle Gagle, the parents of Patricia, Gareth and Janet Clifton, who are sisters. For the reasons set forth below, Judgment is entered for Gareth and Bill based on the Trust provision that provides that the Trustors "may at any time withdraw any properties of the trust", and on Montana's Trust Code; Patricia's Complaint is dismissed.

Patricia filed her Complaint on August 9, 1999, seeking exception from Debtors' discharge under § 523(a)(4)[1] of $148,560.97 plus interest of $565,453.88. Bill and Gareth filed their answer on January 7, 2000, denying any wrongdoing or that they owe Patricia any debt arising from the Trust. After due notice, trial of this cause was held at Butte on February 25, 2000. Patricia appeared represented by counsel David J. Wing ("Wing"), and testified. Defendants appeared represented by attorney Gregory W. Duncan ("Duncan"), and both Bill and Gareth testified. Also testifying were Patricia's daughter Pam

---

1. Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Gosney ("Pam")[2], Kermit Mueller ("Mueller"), Thomas Clifton ("Tom"), and Janet Clifton ("Janet") who is Patricia's and Gareth's sister. Wing stipulated to the admission of all of Defendants' exhibits, Exhibits ("Ex.") A through N, inclusive. In addition to Defendants' exhibits, Plaintiffs' Exhibits ("Ex.") 1, 2, 3, 5, 9, 16, 18, and 42 were admitted. Some of Plaintiffs' and Defendants' Exhibits are duplicative and reference in this Order to an exhibit may be to either or both exhibits. At the close of the evidence the Court granted the parties ten (10) days to submit simultaneous briefs, and took the matter under advisement.

 Patricia's brief was filed on March 6, 2000. Defendants' brief was filed late, on March 13, 2000, prompting Patricia to file a motion to strike Defendants' brief. Defendants responded by filing a motion for extension of time[3]. The parties' post-trial motions have no effect in deciding the merits of this matter, and both are denied[4].

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding to determine dischargeability of particular debts under 28 U.S.C. § 157(b)(2)(I) and § 523(a)(4). This Order contains the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

**2.** Pam testified on rebuttal after Defendant's case-in-chief. Then, Bill testified on surrebuttal.

**3.** Duncan opposed Plaintiff's motion to strike, arguing that Defendants' brief simply addressed the matters presented at trial and that he believed that the rule for counting time under F.R.B.P. 9006(a), which includes weekends and holidays when a period is 8 or more days, was the same as Fed.R.Civ.P. Rule 6(a), which excludes weekends when a period is less than 11 days. Duncan's excuse is no excuse. A person who has consulted with an attorney "can be charged with constructive knowledge of the law's requirements." *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050 (9th Cir.1987). Duncan is charged with knowledge of the applicable rules. However, his failure to timely file Defendants'

## FACTS

Roy Gagle ("Roy") and Myrtle Gagle ("Myrtle") (together the "Gagles") were the parents of Patricia, Gareth and Janet. Roy was employed by the Montana Highway Department as a road and materials engineer. The Gagles lived in a home in Helena during the 1960's, where they acquired real and personal property assets, including unimproved city lots, antiques, artwork, and savings. The Gagles were interested in avoiding the expenses of probate of their estate. In addition, they wished to ensure that their three daughters receive equal shares of the assets remaining after their deaths. Furthermore, they were interested in ensuring that they would have a place to live with family members when they could no longer completely care for themselves, without losing their independence or becoming a burden to their family.

To accomplish these purposes, the Gagles established the Gagle Family Trust by executing a Trust Indenture, Ex. 1, on May 4, 1964. Ex. 2 is Gagles' attorney Peter Meloy's description of Gagles' estate plan dated April 8, 1964, which was sent to all three daughters. Ex. 2 explains:

(1) All of the properties owned or to be owned by Roy and Mrs. Gagle shall be

brief does not change the result in this case, because as explained below Myrtle Gagle's expenditures and dispositions of Trust property were authorized by the Trust.

**4.** Duncan's brief argues the elements of fraud in addition to defalcation, while Wing's trial brief and supplemental brief do not argue and thus abandon the theory of fraud, and instead are limited to defalcation and breach of statutory trustee's duties. Duncan's brief misstates the applicable standard of proof as clear and convincing evidence. Beyond that, Duncan's brief simply argues that Plaintiff failed to prove her case. Ultimately, the burden of persuasion is, in every case, upon the plaintiff. It is within the Court's discretion whether or not to strike Defendants' brief as untimely. Exercising my discretion, the parties' post-trial motions are each denied.

kept for their use and benefit so long as either shall live.

(2) The properties will be conveyed presently to [Gareth] as Trustee to be held until the death of the survivor of Roy and Mrs. Gagle and then to be segregated into three equal portions (except that Roy and Mrs. Gagle shall leave a list as to personal items to go to their children), one for each of their children.

(3) On the death of the survivor of Roy and Myrtle the trust properties shall be distributed equally to you three children, or your share shall go to your children if you be deceased.

(4) Roy and Myrtle shall use a joint bank account with Gareth being named on the account.

Gagles established the Trust the following month in May of 1964. Among the terms of Ex. 1, Section II is the dispositive provision for purposes of this adversary proceeding. Section II states the Trust is revocable at any time by either Roy or Myrtle and further provides: "The Trustors, or either of them, *may at any time withdraw any properties of the trust* and with the acceptance of the Trustee, may add properties to the trust." (Emphasis added). The Court finds that this provision effectively grants the Trustors Roy and Myrtle, during their joint and individual lives, virtually complete control over the disposition of the Trust property[5].

Section III provides: "All of the income from the trust properties shall be paid to the Trustors or the survivor of them. In the event of the incapacity of the Trustors or either of them, the Trustee may make payments to or for the benefit of such incapacitated Trustor." Gareth was named the Trustee, but upon the death of the surviving Trustor (Myrtle), Patricia and Janet were included as Trustees. Ex. 1, Section IV.A. That section also provides that if Gareth is unable or unwilling to serve as Trustee, then Bill would replace her.

As Trustee, Gareth had legal title to all properties held by the Trustee, and had authority to pay Trust expenses from Trust property. Section VIII provides that the Trust be construed under Montana law, and that Gareth "shall receive reasonable compensation for services to be paid out of income from the trust properties." Ex. 1.

Roy suffered a stroke in 1965 which left him partially paralyzed. He retired from the Highway Department in 1966. Roy continued to live with Myrtle in their Helena home until he died in 1973. During this period Roy and Myrtle utilized some of their unimproved real property for purposes of arranging their future affairs. On February 3, 1967, they drafted and signed Ex. 3[6], a letter to Patricia, Gareth, and Janet, to explain their intentions. With respect to certain unimproved real property Roy and Myrtle owned, Ex. 3 provides in pertinent part:

> We felt they [the "Lots on the Hill"] were *there*, maybe to help in our "old age"! You will all remember 4 or 5 years ago we with the help of Peter J. Meloy, attorney ... set up a trust arrangement. This was done to gather up loose ends and to organize our "Estate" to avoid usual probate procedures, etc. This made Gerry "trustee". You'll remember the letter you got at the time ... It in no way deprives any of the 3 of

---

**5.** If the Trustee was unwilling to comply with Roy and Myrtle's wishes, Section II provided that the Trust "may at any time be revoked" by Roy or Myrtle. Pam testified that Gareth had an obligation to advise Myrtle and prevent her from taking property out of the Trust if it was not in her best interests, based upon the terms of Pam's own trust. However, the terms of Pam's trust are totally irrelevant to the Gagle Family Trust and the Trustee's

duties under Ex. 1. Nowhere in Ex. 1 does it state that the Trustee has an obligation to advise the Gagles or prevent them from taking or withdrawing properties from their Trust. Indeed, it specifically states the Gagles "may at any time withdraw any properties of the trust".

**6.** Also Defendant's Ex. D.

you equal shares *of what is left after we are gone. Neither does it deprive us of the right to do as we please with any of our assets while we are here.*

An opportunity has arrived for us to take advantage of some of the lots...it is as follows: We, Daddy Roy & I want it understood we want and intend to live here at 1725–5th as long as we are together... which we intend to be for a long time. However, in the event one of us is left or if it became impossible to stay here we would like to know we would have a comfortable loving place to finish out the years left to us. With this is mind we are planning a way for the lots to help us now.

Patty & Janet both know Gerry & Bill have been planning an addition to their home at 1029 State. But after much thinking they found when they have added 3 or 4 thousand to the house they will still have only 3 bedrooms, 1 bath and nowhere for "Old Fathers and Mothers". The idea has grown among us all. If we could exchange a few lots or several lots, for a well planned separate "apartment" for the "Last Leaf Gagle"...we could look forward to a separate, dignified way to "live with a Daughter". Not having to be in each others hair. To this end we have given permission, yes urged, Kermit Mueller, Bill Schmidt and Gareth Gagle Schmidt...(Gareth to be arbiter)... to Sell, Price to be set by the above 3...enough of the lots to "buy" such an apartment for us. We have placed no particular restrictions on how this will be handled in detail (being glad of the shifted responsibility of making the lots do the most for us). We trust to their love for us and their understanding of our needs to work out satisfaction all around. Bill has agreed to keep careful account of all transactions involving the lots...this to explain any questions that may arise in the future..... At the proper time Kermit will build *for Bill and Gerry,* on a lot already picked out, a home. In the "corner" of this home will be one for us that we hope, never to have to use. This we feel is the very best insurance we can have. This all is with my...Myrtle Gagle's and Roy Gagle's approval—(names signed by them individually).

Ex. 3 (Emphasis added).

On May 28, 1968, Roy and Myrtle signed Ex. G, a statement by which they both stated their intention to give to Bill and Gareth several lots of real property in the Corbin Addition to the City of Helena, plus cash in the amount of $7,872.23 as gifts and to file gift tax returns for such gifts. Ex. G. Exhibits E and F are gift tax returns for the tax year 1968 showing these gifts in the total amount of $10,972.23.

Between 1968 and 1970, Mueller built a home for Bill and Gareth on real property given to them by Roy and Myrtle located at 424 Tamarack in Helena. Additional improvements on this property included the apartment envisioned by Roy and Myrtle in Ex. 3. Myrtle was consulted during the course of construction of the apartment. The cost of the apartment construction was slightly more than $20,000. Bill and Gareth moved into the house on Tamarack upon completion, but despite completion of the attached apartment Myrtle continued to live in her own house for eight years after Roy's death. Myrtle occasionally stayed in the Tamarack apartment during holidays, but preferred to live in her own home, wanting to not be a burden until absolutely necessary.

In addition to gifts to Bill and Gareth, it is not disputed that Myrtle made numerous gifts throughout her life out of Trust property to other family members. For example, on September 30, 1973, Myrtle gifted to Tom and Janet Clifton the sum of $15,000 described as "cancellation of account receivable for funds advanced to" the Cliftons. Ex. J. That gift was to enable the Cliftons to purchase a lot on which to build their house in Colorado. The Cliftons built Myrtle an apartment in

their house like the apartment in Bill and Gareth's house. Tom testified that Myrtle never claimed an ownership interest in her apartment in their Colorado house, although she knew she could live in that apartment if she chose.

Bill worked as a Certified Public Accountant ("CPA") in Helena at Galusha, Higgins & Galusha until he retired as president in the early 1980's. As a CPA he had clients located near Yellowstone Park. After retirement Bill took a position as a stockbroker with D.A. Davidson in Bozeman, Montana.

As Schmidts contemplated moving to Bozeman, Myrtle did not want to be left behind without family in Helena. She also wished to spend more time with her granddaughter Pam, Patricia's daughter, with whom she was very close. Pam owned real property and a home near Bozeman in the Gallatin Canyon, near where Myrtle was raised on a farm. Schmidts had been involved with the planning of Pam's Gallatin Canyon house, and they discussed the idea of moving to the Gallatin Canyon with Pam before raising the idea with Myrtle. For her part, Pam was interested in obtaining Myrtle's collection of Wedgwood china. Pam and her husband offered to exchange some of their Gallatin Canyon property for Myrtle's Wedgwood collection, and Myrtle agreed.

Ex. 5 is a letter from Bill explaining the exchange. Pam testified her Gallatin Canyon property had a value of $25,000. On March 24, 1981, Myrtle signed a gift tax return, Ex. K, describing a gift of the Wedgewood collection valued at $21,961.50 to Pam as of September 30, 1980[7]. Myrtle received Pam's Gallatin Canyon property and gifted it to Bill and Gareth in 1981, valued at $25,000.00, together with a gift of $28,811.92 in cash. Ex. L is a gift tax return signed by Myrtle on April 14, 1982,

evidencing these gifts. After Bill earned his stockbroker's license, Mueller built the Schmidts their home on the Gallatin Canyon property, including a separate apartment for Myrtle. Bill testified that he and Gareth could not afford to build the Gallatin Canyon home on their own, and that it was designed so that they could take care of Myrtle, who had become the driving force behind the move to the Gallatin Canyon. Bill and Gareth withdrew over $80,000 out of their retirement and profit sharing funds in 1982 to pay for the Gallatin Canyon home.

Bill and Gareth had discussed Myrtle's desire to live with them as she became more dependent on Gareth for her transportation and care. Myrtle wanted to "put her house together" with the Schmidts, to avoid being a burden and to retain her independence. In return for Schmidts' agreement to combine their homes and care for her, Myrtle decided to use her Trust property to contribute to the costs of the homes and apartments, and in that context Myrtle gifted land, cash and debt forgiveness to the Schmidts and Cliftons. As Myrtle stated to her daughters in 1967, she was glad to shift the responsibility for making her property do the most for her. Ex. 3. Undoubtedly, Myrtle's desire to be free from responsibility of ownership was reinforced after her attorney sent her Ex. 9 dated May 28, 1982, explaining two quit claim deeds and an assignment of contract proceeds for the sale of her home in Helena[8].

Myrtle sold her Helena house to Rick Hill for $65,000 by contract for deed in preparation for her move to Gallatin Canyon. Myrtle contributed much of the contract proceeds to refinance Schmidts' Gallatin Canyon home and reduce their payments. Ex. N is a gift tax return

---

7. As rebuttal witnesses, Pam and Bill disputed the propriety of filing a gift tax return for the exchange of land for china. That dispute is not relevant to Patricia's § 523(a)(4) adversary proceeding.

8. The attorney stated: "I know that your immediate reaction to this volume of paper will be 'is all this really necessary'. I assure you that it is necessary to carry out your current plan."

signed by Myrtle on March 7, 1983, showing she gifted a $55,000 contract receivable from Rick Hill and an additional $5,082.82 in cash to Bill and Gareth in January of 1982. All of that gift[9] went into the Gallatin Canyon home and apartment.

Myrtle's apartment in the Gallatin Canyon home had separate phone and utility meters, and a separate kitchen. While living in the Gallatin Canyon home with Bill and Gareth, Myrtle enjoyed relatively good health[10], although she became diabetic. She hired a cleaning lady, but did much of her own housework. Myrtle sometimes dined with the Debtors, but she would regularly write Gareth checks for food. Other times Myrtle would prepare her own meals in her own kitchen, or Gareth would take her leftovers. Gareth or Pam would provide Myrtle with transportation when she needed to go to town. Gareth taught Myrtle how to drive during this period so she could be more independent.

Pam testified that Myrtle knew that she was not listed as an owner of the Gallatin Canyon property on the deed, and approved because she did not want the responsibility or liability of ownership. In 1984, Pam moved away from Gallatin Canyon, but retained her property there.

In 1987, Schmidts and Myrtle moved to a house on Heritage Drive in Bozeman, Montana and put the Gallatin Canyon home on the market. The Gallatin Canyon home sold for $250,000.00, of which Schmidts received $72,023.62 in cash on October 1, 1987. Ex. 42. In Bozeman, Myrtle again had a separate living area in the basement. She paid $7,000 in Trust funds to have her own kitchen installed and for other remodeling. She continued to write monthly checks to the Debtors on the Trust account for living expenses, utility bills, food, and transportation, in amounts generally running from $345 to $500 per month. She lived with Bill and Gareth until 1990. During this period Patricia would visit Myrtle two or three times each year when she had 3-day weekends.

Gareth developed breast cancer, and could no longer care for Myrtle. After Myrtle, Bill, Gareth and Patricia spent a Christmas together on the West Coast visiting family members, Myrtle decided to move closer to Patricia. She moved to Vancouver, Washington in December of 1990. She had planned to live there with Patricia, but became ill with shingles and moved into the Cascade Inn Retirement Center ("Cascade Inn") in Vancouver, a retirement facility with several levels of care. Bill and Gareth moved to Vancouver to be near Myrtle and to help with her care as the need arose. At the Cascade Inn Myrtle lived in a 1 bedroom unit with a kitchen for six years until she died on August 3, 1996.

Upon Myrtle's death, Patricia and Janet became co-Trustees with Gareth pursuant to the terms of Ex. 1. Gareth asked Janet's husband Tom, who is also a CPA, to prepare an accounting for the Trust. Tom testified that he examined the Trust accounts and traced the Trust's assets and proceeds. Tom concluded that all Trust property was accounted for, and nothing was missing.

All three Trustees: Gareth, Janet and Patricia[11], met at Schmidts' house in Vancouver shortly after Myrtle's death, and executed Ex. 16, dated August 10, 1996. Ex. 16 states that Bill provided the Trustees with a report showing the Trust balance sheet and income and expense statement as of Myrtle's death. Ex. 16

---

9. There is no allegation or evidence that Myrtle or Roy were ever mentally incompetent when they made any of their gifts.

10. Patricia testified that Myrtle had several operations between 1982 and 1990, but always recovered.

11. Patricia testified that she did not read Ex. 16, but signed it anyway because it was just a partial plan to get Myrtle's estate settled.

disposes of certain properties, including loans owing to the Trust by family members. One such loan was an installment note owed by Bill and Gareth in the sum of $15,419.16. Ex. 16 states: "Patricia and Janet decided that it was their wish to cancel their portion of this obligation in recognition of the many years of Gareth's care for their Mother, following Roy's death in 1973, both in Helena and the years in Gallatin Canyon & Bozeman and the subsequent move to Vancouver." Remaining unclaimed antiques and knick-knacks were relinquished to Patricia and Pam. Ex. 16 closes by stating, directly above Patricia's signature: "The arrangements as set forth ... above are acceptable to us as part of our responsibilities as Trustees of the Roy and Myrtle Gagle Revocable Trust dated 5/4/64."

Shortly after Ex. 16 was signed by all three sisters, Patricia questioned the accounting of Trust properties. Patricia remembered Roy telling her that the estate would have substantial assets which all three (3) sisters would share equally after he and Myrtle were gone. While Patricia knew of the Trust money and property which went into the Gallatin Canyon house, she had no idea of the amount of the gifts. Roy and Myrtle had told Bill, Gareth and Janet not to share information on their gifts with other family members. Patricia believes that all the Trust property which went into the apartments in Bill and Gareth's houses remained Trust property.

In a moment of pique, Bill responded to Patricia's questions with Ex. 18, a comparison of what Bill and Gareth considered was the value of care they provided for Myrtle for the period from 1982 to 1990 ($151,200.00) with the value of the gifts Myrtle gave to Gareth and Bill ($120,895.26), and Bill's estimate of the value of the 32 years of accounting work he provided to Roy and Myrtle without pay ($12,800). Ex. 18 places the value of care

provided to Gareth for 108 months at the rate of $1,400.00 per month. It concludes by stating the Trust owes Bill and Gareth a balance of $43,104.74. However, both Bill and Gareth testified that they did not actually charge Myrtle for their care, and did not expect payment because of the *quid pro quo* understanding they had with Myrtle that they would care for her in return for her gifts of Trust property in contribution to their homes in Helena, Gallatin Canyon and Bozeman.

Patricia sued Bill and Gareth in Case No. 97–2–01324–4 in Superior Court of Washington for Clark County, in *Patricia Trunnels v. William and Gareth Schmidt* (the "Washington litigation"). She filed her complaint for accounting and removal of trustee on March 25, 1997, asking that a constructive trust be imposed upon all of Schmidts' assets until the extent of Trust property is determined. Patricia also requested she be appointed Trustee of the Trust and that all prior Trustees be removed[12].

Bill and Gareth opposed Patricia's lawsuit, and incurred over $80,000 in legal fees defending against it. After the superior court announced its intention to enter summary judgment for Patricia, Bill and Gareth filed their Chapter 7 petition on May 17, 1999 in the U.S. Bankruptcy Court for the District of Montana. Their address as listed on their petition is 128 Humbolt Loop, in Helena, Montana.

Debtors listed Patricia on Schedule F with two unsecured claims, one in the sum of $1.00 and the other in the sum of $679,201.00 from the Washington litigation. On Schedule B they list $1.00 value for Gareth's ⅓ interest as beneficiary of the Trust.

Patricia filed two motions to modify stay in the Schmidts' Chapter 7 case: One motion requested the authority to proceed in the Washington litigation to remove Debtors as Trustees of the Trust, which was granted[13]; and the second motion request-

---

12. Janet, who was a co-Trustee upon Myrtle's death, was not named as a party-defendant.

13. Debtors moved for relief from the Order granting Patricia's first motion on the

ed the turnover of Trust property, which was granted to the extent such property was in the Debtors' possession or control. Patricia filed her dischargeability complaint in this adversary proceeding on August 9, 1999. A Discharge of Debtors was entered on August 10, 1999.

## DISCUSSION

Patricia's Complaint seeks exception from discharge pursuant to § 523(a)(4), alleging Bill and Gareth violated their fiduciary duties and committed fraud, defalcation, undue influence and coercion[14] in taking Trust assets. Bill and Gareth contend that Patricia failed to prove defalcation or wrongdoing by them, and that Myrtle's gifts to them were part of their *quid pro quo* with Myrtle to provide her housing near family in her later years according to her wishes. This family dispute arose because less Trust property remained after Myrtle's death than Patricia expected, given Myrtle's gifts of Trust property to Bill and Gareth and the Cliftons[15].

■■■ Exceptions to discharge should be strictly construed against an objecting creditor and in favor of a debtor in order to effectuate the fresh start policy afforded by the Bankruptcy Code. *Moore v. United States Department of Education, et al.*, 17 Mont. B.R. 106, 108 (Bankr.Mont.1998); *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983). The standard of proof for the dischargeability exceptions under § 523(a) is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *Donath*

*v. Sage*, 15 Mont. B.R. 40, 43 (Bankr.Mont. 1995).

■■■ Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Nondischargeability of liability under Section 523(a)(4) requires a determination of (1) the existence of a fiduciary relationship; and (2) acts of defalcation. *F.D.I.C. v. Jackson*, 133 F.3d 694, 702 (9th Cir.1998); *In re Chavez*, 140 B.R. 413, 422 (Bankr. W.D.Tex.1992). The facts establish a fiduciary relationship between Gareth and Roy and Myrtle, during their joint and individual lives. A fiduciary relationship occurred between Gareth, Patricia and Janet upon Myrtle's death, as she was the survivor trustor of this revocable trust. Ex. 1 establishes that Gareth was sole Trustee of the Trust, and Myrtle, as the person holding the power to revoke, held all rights afforded a beneficiary. Montana Code Annotated ("Mont.Code Ann.") § 72–33–701. Patricia's rights as a beneficiary arose at Myrtle's death. However, Bill was not named a trustee of the Trust by Ex. 1 except in the event Gareth was unable or unwilling to serve. No evidence establishes Bill's role as a trustee or fiduciary. The evidence does establish that Bill provided financial and accounting services to Gareth, Myrtle and Roy.

■■■ The existence of a fiduciary relationship is determined under federal law, but with reference to state law. *F.D.I.C. v. Jackson*, 133 F.3d at 703; *Lewis v. Scott*, 97 F.3d 1182, 1185 (9th Cir.1996).

grounds that Bill was not a Trustee. The Court denied that motion.

14. Patricia's briefs address defalcation and breach of statutory trust duties. They do not address theories of fraud, undue influence or conversion, and therefore the Court deems those theories abandoned and unproven with no support in the record. There is no dispute that Myrtle was strong-willed and independent, and made her own decisions to gift or spend Trust property. Likewise, the Complaint's allegations that Defendants sold Trust assets to friends at terms disfavorable to the

Trust are unsupported by any evidence, contradicted by Mueller's testimony, and were not argued in either of Patricia's briefs and are thus deemed abandoned and unproven.

15. Patricia testified that Myrtle did not gift $15,000.00 to the Cliftons to build her an apartment in their Colorado house. However, Janet and Tom both testified she did, and Ex. J corroborates their testimony and demonstrates how uninformed Patricia was about Myrtle's gift giving.

Contentions are made that the Washington litigation may have either a *res judicata* effect (claims preclusion) or a collateral estoppel effect (issue preclusion) on whether Bill was a fiduciary. Neither doctrine applies in this proceeding given the status of the Washington litigation at the time Schmidts filed their bankruptcy case. No orders, findings, conclusions or judgments are before the Court as exhibits upon which either doctrine could be applied. *See generally Robinson v. First Wyoming Bank, N.A.*, 274 Mont. 307, 318, 909 P.2d 689, 696 (1995)("Collateral estoppel bars an action ... when: (1) the issue presented in a later action has been decided in a prior adjudication; (2) a final judgment in the action was issued; and (3) the party against whom collateral estoppel is asserted was a party to the previous litigation. [*HKM Assoc. v. Northwest Pipe Fittings*, 272 Mont. 187, 192, 900 P.2d 302, 305 (1995) ] (*citing Berlin v. Boedecker*, 268 Mont. 444, 453, 887 P.2d 1180, 1185 (1994))."); and *Raymond v. Pickering (In re Pickering)*, 14 Mont. B.R. 282, 284–86, 182 B.R. 268, 270–72 (Bankr.Mont. 1995)(This case criticizes the decision in *Berlin v. Boedecker* ).

Patricia's Washington litigation · simply did not reach a "stage at which issue preclusion is appropriate". *Pickering*, 14 Mont. B.R. at 285–86, 182 B.R. at 271 (*quoting* Restatement (Second) of Judgments, § 27, p. 262 (1982)). Therefore, neither *res judicata* nor collateral estoppel applies to any of the issues in this case, including whether Bill is a fiduciary.

▪ Patricia does not cite any Montana law under which Bill becomes a fiduciary to the Trustors or beneficiaries. He was married to the Trustee, Gareth, and if she was unwilling or unable to serve as Trustee he was to replace her. Ex. 1, part IV.A. Gareth's unwillingness or inability to serve did not occur. Bill provided accounting services to Roy and Myrtle, in-cluding preparing their tax returns, without compensation for 34 years. However, Patricia cites no Montana law making Bill a fiduciary for providing gratuitous accounting services and advice. Montana law regulates public accountants at Mont. Code Ann. § 37–50–101, *et seq.* However, the Court can find no section making Bill a fiduciary by virtue of his gratuitous accounting services and advice provided to Roy, Myrtle and Gareth, which could be deemed equivalent to the Arizona state law making a corporate director a fiduciary of the corporation[16] in *F.D.I.C. v. Jackson*, 133 F.3d at 703, or to the California law imposing fiduciary obligations on a real estate broker who collected rents in that capacity in *In re Niles*, 106 F.3d 1456, 1459 (9th Cir.1997).

▪ For purposes of § 523(a)(4), any fiduciary relationship must arise from an express or technical trust that was imposed before and without reference to wrongdoing that allegedly caused the debt. *Niles*, 106 F.3d at 1459; *Lewis v. Scott*, 97 F.3d at 1185 (*citing Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986)). Patricia failed to establish that a fiduciary relationship between Bill, Roy, Myrtle or the beneficiaries arose from an express or technical trust that was imposed before and without reference to the gift transfers that form the basis of Patricia's defalcation claim. Indeed, Patricia's argument that Bill is a fiduciary is based entirely by reference to his gratuitous accounting services, advice, and preparation of gift tax returns to Roy, Myrtle and Gareth. Under *Lewis* and *Ragsdale v. Haller* the trust must arise without reference to such "wrongdoing". The Court concludes that Patricia failed to prove the existence of a fiduciary relationship between Bill and the Trustors or beneficiaries which is the first requirement under § 523(a)(4). *F.D.I.C. v. Jackson*, 133 F.3d at 702. Having failed to establish the first *F.D.I.C. v. Jackson*

---

**16.** One Montana case construing the fiduciary relationship of a majority shareholder of a close corporation for a minority shareholder is *Daniels v. Thomas, Dean & Hoskins, Inc., et al.*, 246 Mont. 125, 136–37, 804 P.2d 359, 365–66 (1990).

requirement, Patricia's § 523(a)(4) non-dischargability complaint against Bill must be dismissed for failure to establish that he was a fiduciary.

■ Turning to Gareth, she is a fiduciary as Trustee under Ex. 1. Patricia satisfied her burden of proof that Gareth was a fiduciary of the Trust to whom funds had been entrusted; the burden shifts to Gareth to render a full accounting for all funds received by her for Myrtle's benefit and then for the beneficiaries after Myrtle's death. *Niles,* 106 F.3d at 1461–62.

■ In the Ninth Circuit, defalcation for purposes of § 523(a)(4) includes any behavior by a fiduciary, including innocent, negligent, and intentional defaults of fiduciary duty resulting in failure to provide a complete accounting. *F.D.I.C. v. Jackson,* 133 F.3d at 703; *Lewis,* 97 F.3d at 1186; *Lewis v. Short (In re Short),* 818 F.2d 693, 694 (9th Cir.1987); *Woodworking Enters., Inc. v. Baird (In re Baird),* 114 B.R. 198, 204 (9th Cir. BAP 1990). *Lewis* held that "[a]n individual may be liable for defalcation without having the intent to defraud." *F.D.I.C. v. Jackson,* 133 F.3d at 703, *Lewis,* 97 F.3d at 1187; *see also Kaufman v. Tallant (In re Tallant),* 207 B.R. 923, 929 (Bankr.E.D.Cal.1997) ("If the relationship between the debtor and the creditor falls within this [fiduciary] provision, then the slightest defalcation will render the resulting debt nondischargeable." (*citing Lewis,* 97 F.3d at 1186)); *see also In re Briles,* 228 B.R. 462, 467 (Bkrtcy.S.D.Cal. 1998).

■ The Court concludes that Gareth satisfied her burden of accounting for all Trust properties. Ex. 16, 18, E, F, G, H, I, J, K, L, and N list and account for Trust properties gifted by Roy and/or Myrtle to her children and grandchildren. In addition to Bill's thorough and complete accounting shown by those exhibits, Gareth asked Tom Clifton, who is also a CPA, to prepare an accounting for the Trust. Tom testified that he reviewed the Trust records and traced Trust assets and proceeds, including the gift tax returns. Tom concluded that a full accounting of the Trust property was established through the Trust records and nothing was missing. Patricia offered no expert or accounting testimony to the contrary. No dispute exists that Myrtle spent Trust assets on her living expenses, gifts and loans. Therefore, based on the exhibits and Bill's and Tom's testimony, which this Court finds credible, the Court concludes that Gareth has satisfied her duty to provide a complete accounting of all Trust property received by her as Trustee. *F.D.I.C. v. Jackson,* 133 F.3d at 703; *Lewis,* 97 F.3d at 1187. Indeed, Pam and Patricia demonstrated in their testimony that the Schmidts provided them with gift tax returns and reports from which a full accounting of the gifts of Trust property by Myrtle was readily discernible[17].

■ The essence of this family dispute is over the propriety and size of Myrtle's gifts of Trust property. Patricia feels that her share of the Trust assets were depleted. Roy had told her that substantial assets would be remaining in the Trust for all three sisters to share equally. Undoubtedly, Patricia was surprised and disappointed to learn that Myrtle had spent a large portion of Trust assets, including gifts to Bill and Gareth for the construction of her living apartments in Helena, Gallatin Canyon and Bozeman. However, Ex. 1 gave Myrtle the right "at any time to withdraw any properties" of the Trust. The fact that Myrtle withdrew and gifted Trust property to Bill and Gareth, as well as to Janet, Tom and other family members, does not constitute defalcation or bad faith by Gareth.

Moreover, the Trust Code, contained in Title 72 of the Montana Code Annotated ("Mont.Code Ann."), chapters 33 through

---

**17.** Janet and Bill both testified that Roy and Myrtle told them not to tell Patricia or other family members about the gifts they made. Patricia and Pam both testified they learned about the amount of the gifts in the course of the Washington litigation.

36, provides several provisions germane to this Court's consideration of the issues submitted by the parties:

> Except to the extent that the trust instrument otherwise provides or when the joint action of the trustor and all beneficiaries is required, during the time that the person holding the power to revoke the trust is competent:
>
> (1) the person holding the power to revoke, and not the beneficiary, has the rights afforded beneficiaries under chapters 33 through 36;
>
> (2) the duties of the trustee are owed to the person holding the power to revoke.

Mont.Code Ann. § 72–33–701.

Section 72–34–513 of the Trust Code further provides, in pertinent part:

> ... a trustee of a revocable trust is not liable to a beneficiary for any act performed or omitted pursuant to written directions from the person holding the power to revoke made when the person is competent, including a person to whom the power to direct the trustee is delegated.

Section 72–34–514 provides:

> (1) Except as provided in subsections (2) and (3), a beneficiary may not hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary consented to the act or omission before or at the time of the act or omission.
>
> (2) The consent of the beneficiary does not preclude the beneficiary from holding the trustee liable for a breach of trust in any of the following circumstances:
>
> (a) whenever the beneficiary was under an incapacity at the time of the consent or of the act or omission;
>
> (b) whenever the beneficiary at the time consent was given did not know of his rights and of the material facts that the trustee knew or should have known and that the trustee did not reasonably believe that the beneficiary knew; or

> (c) whenever the consent of the beneficiary was induced by improper conduct of the trustee.
>
> (3) Whenever the trustee has an interest in the transaction adverse to the interest of the beneficiary, the consent of the beneficiary does not preclude the beneficiary from holding the trustee liable for a breach of trust under any of the circumstances described in subsection (2) or whenever the transaction to which the beneficiary consented was not fair and reasonable to the beneficiary.

One additional statutory provision provides:

> (1) Except as provided in subsection (2), if the trustee, in breach of trust, enters into a transaction that the beneficiary may at his option reject or affirm, and the beneficiary affirms the transaction, the beneficiary may not thereafter reject it and hold the trustee liable for any loss occurring after the trustee entered into the transaction.
>
> (2) The affirmance of a transaction by the beneficiary does not preclude the beneficiary from holding a trustee liable for a breach of trust if, at the time of the affirmance, any of the following circumstances existed:
>
> (a) the beneficiary was under an incapacity;
>
> (b) the beneficiary did not know of his rights and of the material facts:
>
> (i) that the trustee knew or reasonably should have known; and
>
> (ii) that the trustee did not reasonably believe that the beneficiary knew;
>
> (c) the affirmance was induced by improper conduct of the trustee; or
>
> (d) the transaction involved a bargain with the trustee that was not fair and reasonable.

In reviewing the record, the transactions and alleged breaches of fiduciary duties occurred during Myrtle's lifetime while she held the powers to revoke the trust, to withdraw assets and to add assets. Conse-

quently, Myrtle, under Mont.Code Ann. § 72–33–701 and as the successor trustor, in this revocable trust had the rights afforded the beneficiaries under the Trust Code, and not the subsequently named beneficiaries, i.e., those individuals named in Article VI of Ex. 1. The testimony, and exhibits submitted at the trial in this adversary proceeding further confirmed and established Myrtle's involvement in the transactions through written directive satisfying § 72–34–513, through consent satisfying § 72–34–514 and through affirmation satisfying § 72–34–516. The evidence establishes that Myrtle was competent, was not suffering any incapacity at the time of the transactions involved in this litigation, was properly informed, and was not induced to complete a transaction or gift by improper conduct of the trustee.

Patricia's Complaint alleges that Roy and Myrtle "explained to several witnesses" their purpose in creating the Trust included having "the trust assets grow in equity by investing in real estate." Complaint, ¶ 7. However, the record does not contain any witness testimony or evidence showing such an intent by Roy and Myrtle to invest Trust assets in real estate solely for growth. Two exhibits, in fact, confirm the purpose and objective of the Trust to be administrative and not solely growth related. See Ex. 2, Letter from Attorney Meloy to three daughters, dated April 8, 1964("The object of the above planning is to avoid the time and costs of probate as well as inheritance taxes."); and Ex. 3, Letter from Myrtle to three daughters, dated February 3, 1967("This was done to gather up loose ends and to organize our 'Estate' to avoid usual probate procedures, etc."). Even Pam testified that Myrtle did not want the responsibility of ownership of real property, just as Gareth testified. The Court finds that Gareth's testimony that Myrtle never discussed with Schmidts her having ownership interests in the Schmidt's homes is credible, and that Patricia failed to prove that any of the gifts of Trust property by Myrtle to Bill and Gareth were for the purposes of the Trust acquiring ownership interests in Schmidts' homes.

Patricia argues that the attorneys' references in Ex. 2 and in Ex. 9 that the Trust properties "shall be kept", and "as your contribution toward the cost of your new residence" show that Myrtle and Roy intended to have ownership interests in their apartments. The Court does not agree. Such references are taken out of context. Patricia's theory is that any property which came into the Trust remained Trust property even after she gifted it to Bill and Gareth, or to Tom and Janet. Such a theory conflicts with the gift tax returns admitted into evidence, and conflicts with the testimony of Bill, Gareth, Mueller, Tom and Janet that Myrtle's transfers of Trust property were intended as gifts.

Patricia cites Commissioner v. Wemyss, 324 U.S. 303, 306, 65 S.Ct. 652, 89 L.Ed. 958 (1944), as support for her contention that the gift tax returns "do not by themselves establish that the transfers were gifts." More evidence than just the gift tax returns are contained in the record. The gifts evidenced therein are corroborated by Bill and Gareth's testimony, by the testimony of Tom, Janet, and Mueller, each of whom testified that Myrtle's transfers of real property and cash to Bill and Gareth were gifts. See Ex. 3, 7, G. As Janet is a beneficiary of the Trust, Janet and Tom's testimony corroborating Myrtle's transfers to Bill and Gareth as gifts carries more weight given the benefit Janet would receive from any recovery in this case by Patricia.

■ Furthermore, the Supreme Court in Commissioner v. Wemyss did not hold that gift tax returns were not evidence of donative intent. It held that, for ascertainment of gift tax purposes, Congress dispensed with the "elusive state of mind" that is the test of "donative intent", and replaced it with a test deeming it a gift where property is transferred for less than adequate and full consideration in money or money's worth. 324 U.S. at 306, 65

S.Ct. at 654. Under the *Commissioner v. Wemyss* test the gifts shown in gift tax returns Exhibits E, F, H, I, J, L, and N were almost certainly gifts at the time, as they were exchanged for no more than Schmidts' present care or promise of future care, which may be, in this proceeding, considered "less than adequate and full consideration in money or money's worth"[18]. To avoid any issue with the Internal Revenue Service over whether the transactions were gifts or not, Bill prepared gift tax returns and Myrtle and Roy, prior to his death, signed and filed the returns. Thus, the test in *Commissioner v. Wemyss,* if applicable in this case at all, supports a finding that Myrtle's transfers to Bill and Gareth were gifts.

Pam and Patricia both insist that the gifts from Roy and/or Myrtle to Bill and Gareth were not "out and out gifts". However, their opinions are contradicted by Roy's and Myrtle's own statements on their gift tax returns. Ex. E, F, G, H, I, L, and N. The terms of the Trust gave Roy and Myrtle the right "at any time to withdraw any properties of the trust". Ex. 1. Roy and Myrtle, pursuant to the their reserved powers under the Trust, withdrew real property and cash from the Trust and gifted them to Bill and Gareth, Ex. 1, Section II. Roy and Myrtle's own statements in Ex. G establish that Pam's and Patricia's testimony that Roy and Myrtle did not intend the gifts as "out and out gifts" is not grounded in fact: "It is my intention that this Lot be a gift to Bill M. and Gareth G. Schmidt, in addition of cash transfered [sic] out of the trustee savings account on this day." Patricia contends that the gift tax returns are not evidence of donative intent. Even if that were true, Ex. G is not a gift tax return. Patricia testified that she "does not agree"

with Ex. G, but it was admitted into evidence by stipulation, without objection. The Court finds that Ex. G is uncontroverted and conclusive evidence of Roy's and Myrtle's intent that the property and cash set forth in Ex. E and F were gifts.

■ Patricia might argue that Ex. K, the gift tax return covering the gift by Myrtle to Pam of Wedgewood china, shows that the gifts to Debtors were not intended as a gift because Myrtle in fact exchanged her Wedgwood china for the lot on which the Gallatin Canyon home was built[19]. Even if Ex. G did not conclusively prove that Roy and Myrtle intended the transfers in Ex. E and F as gifts, this argument still fails. Just as Myrtle exchanged her Wedgwood china for the Gallatin Canyon real property with Pam, her gifts to Bill and Gareth could be construed as in exchange for their care and accommodation of Myrtle's desire for independent living arrangements with her family. Either way, Patricia failed to show that Gareth and Bill committed defalcation in a fiduciary capacity by accepting gifts of Trust property from Roy and Myrtle.

Roy's and Myrtle's gifts of Trust property to Bill and Gareth to build apartments for them were their "insurance" of a "comfortable loving place" to live with family. Ex. 3. All witnesses agreed that Myrtle was strong willed, competent and independent. As Myrtle explained to her daughters, the Trust did not "deprive us of the right to do as we please with any of our assets while we are here." Ex. 3. The beneficiaries under Ex. 1 were to have "equal shares of what is left after we are gone." Ex. 3.

A case involving a similar family situation is *In re Beeman,* 225 B.R. 522, 526–27 (Bankr.N.H.1998). The court in *Beeman*

---

18. In comparison, Ex. K, the gift tax return for the Wedgewood collection given to Pam, might be deemed not a gift since Pam exchanged the Wedgwood collection for the Gallatin property and they had somewhat comparable values. The court can envision situations where present care or promises of

future care may constitute adequate consideration.

19. Ex. 5 shows that Bill recommended that Pam's Gallatin Canyon property be conveyed from Myrtle into the Trust.

held that the plaintiff failed to prove a defalcation by a preponderance of the evidence where certain improvements and additions made to a mother's residence were made at the mother's insistence and for her health and comfort. 225 B.R. at 527. Likewise in the instant proceeding, the apartment additions in Schmidts' homes in Helena, Gallatin Canyon and Bozeman were paid for at Myrtle's insistence through gifts of Trust property to assure her independent living while near family[20]. The Court concludes that Bill and Gareth's acceptance of gifts from Myrtle does not constitute defalcation or bad faith, because the evidence shows that Myrtle had the right to do as she pleased with Trust assets under Ex. 1, and the gifts were at her insistence to preserve her living quarters.

▆▆▆▆ Patricia cites several sections from Montana's Trust Code which she contends Gareth breached and which she argues establishes Gareth's defalcation and bad faith, including: Mont.Code Ann. § 72–34–104 (duty to deal impartially with two or more beneficiaries); § 72–34–105 (duty to avoid conflict of interest); § 72–34–107 (duty to take control of and preserve trust property); § 72–34–110 (duty to keep trust property separate and identified); and § 72–34–124 (general duty to report information to beneficiaries). These statutory duties are important; however, the application of these duties must consider the limitations set forth in Mont.Code Ann. § 72–33–701. The trustee, in a revocable trust, owes such duties to the person holding the power to revoke. Until Myrtle's death or incompetency, she held the power to revoke and Gareth owed her duties to Myrtle, not to any other named beneficiaries in the Trust. *See* Mont.Code Ann. § 72–33–701. Consequently, as discussed above, a trustee of a revocable trust is not liable to a beneficiary when the trustee is following written directions, has the consent or has an affir-

mation from the person holding the power to revoke. *See* Mont.Code Ann. §§ 72–34–513, 72–34–514, and 72–34–516 (The evidence does not establish any circumstances imposing liability under the cited statutes.). Ironically, Gareth may have been liable to Myrtle if Gareth had not followed the directions of her mother under Mont. Code Ann. § 72–34–517, unless incompetency had been established. Myrtle's right to do as she wished with Trust property was embodied in the Trust Indenture. Ex. 1, 3.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine dischargeability of a particular debt under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(4).

3. The Plaintiff failed to establish that any final judgment or order on the merits was entered in the Washington litigation, and is thus not entitled to *res judicata* or collateral estoppel treatment of the Washington superior court's announced intent to enter summary judgment.

4. Plaintiff failed to show by a preponderance of the evidence that Defendant Bill Schmidt had a fiduciary relationship with Roy and Myrtle Gagle, or with the beneficiaries, as required under § 523(a)(4).

5. Defendant Gareth Schmidt has satisfied her burden of proof under § 523(a)(4) to provide a complete accounting of all Trust funds received by her for Plaintiff's benefit, and that she complied with her fiduciary duty to account for all questioned transactions. *F.D.I.C. v. Jackson*, 133 F.3d at 703; *In re Niles*, 106 F.3d at 1462. Defendants have shown by a preponderance of the evidence that the terms of the Trust permitted the Trustors to do as they

---

**20.** Pam and Patricia both testified as to Myrtle's insistence that she pay her own way and not be a burden on her family.

wished with assets of the Trust, and that the Trustors gifted Trust assets to family members in order to provide a "comfortable loving place to finish out [their] years" with family members.

6. Plaintiff has failed her burden under § 523(a)(4) of showing by a preponderance of the evidence that Gareth committed fraud or defalcation while acting in a fiduciary capacity.

7. Gareth owed her duties as a trustee to Myrtle, the person holding the power to revoke in the revocable trust identified as Ex. 1 and dated May 4, 1964. Mont.Code Ann. § 72–33–701. Given written directions, consent and affirmation from Myrtle for the transactions at issue in this proceeding, Gareth has no liability to the beneficiaries, i.e. Patricia Trunnels, Janet Clifton and Gareth Schmidt. Mont.Code Ann. §§ 72–34–513, 72–34–514, and 72–34–516. The circumstances imposing liability under these statutory provisions do not exist in this proceeding.

IT IS ORDERED Judgment shall be entered for the Defendants/Debtors Bill Schmidt and Gareth Schmidt dismissing Plaintiff's § 523(a)(4) dischargeability Complaint; and Patricia Trunnels' individual and trustee claims against the Debtors Bill and Gareth Schmidt arising from the Gagle Family Trust are dischargeable and discharged pursuant to 11 U.S.C. § 523(a)(4).